UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA  )
  )
  )
  )
VS.  )    **Dkt. Nos.**  **1:25-cr-00015-MSM**
  )        **1:25-cr-00057-MSM**
  )
ELIJAH GAVIN  )

---

## ELIJAH GAVIN'S SENTENCING MEMORANDUM

Shortly, Elijah Gavin will appear before this Court for sentencing in the above-captioned matters. He has admitted that he and his co-conspirators engaged in a construction fraud scheme in Rhode Island and elsewhere by fraudulently inducing property owners to pay for home and building repairs that were not needed and were not performed. Mr. Gavin took money from the victims and wired it to co-conspirators. (Dkt. 1:25-cr-00015-MSM). He also engaged in immigration fraud, by failing to disclose his criminal record in obtaining permission to travel to the United States from the United Kingdom. (Dkt. 1:25-cr-00057-MSM).

The final presentence report (PSR) calculates an advisory prison sentence of 33 months to 41 months (ECF#25)1.

---

1 This guideline calculation includes a two-point enhancement pursuant to USSG §2B1.1(b)(10)(A) based upon U.S. Probation's determination that Mr. Gavin "relocated or participated in relocating a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials". (PSR ¶31). The defendant filed a timely objection to this enhancement. (PSR Doc. 6-2). If this Court sustains Mr. Gavin's objection the resultant guideline is 27 months to 33 months.

Mr. Gavin prays for a sentence of twenty-four months imprisonment. He is not asking the Court to impose a term of supervised release to follow, as he expects to be deported because he has both an immigration detainer and outstanding warrants for his arrest in his home country, Northern Ireland.

**HISTORY AND CHARACTERISTICS OF THE DEFENDANT**

Elijah Gavin's mother, Bridget, took him and his four siblings out of school when he was just eight years old to escape her abusive, alcoholic, and drug addicted husband, John. Much of Elijah's childhood was spent in fear and poverty; he never returned to school.

Elijah Gavin and his extended family are Irish Travellers. "Mincéirs (Irish Travellers) are a traditionally nomadic ethnic minority indigenous to Ireland, distinct from the majority Irish population."[2]

A 2019 parliamentary report from the UK's House of Commons found:

Gypsy, Roma and Traveller people have the worst outcomes of any ethnic group across a huge range of areas, including education, health, employment, criminal justice and hate crime. Too often local authorities and public services fail to differentiate between different groups who have different needs. Our inquiry has found that, while many inequalities have existed for a long time, there has been a persistent failure by both national and local policy-makers to tackle them in any sustained way. This failure has led to services that are ill-

---

[2] *A Brief History of the Insitutionalisation of Discrimination Against Irish Travellers* December 11, 2018. https://www.iccl.ie/news/whrdtakeover/

equipped to support Gypsy, Roma and Traveller people to use services that they need and are entitled to.3

> Romany Gypsies and Irish Travellers are legally recognised as ethnic groups, and protected from discrimination by the [UK's] Race Relations Act (1976, amended 2000) and the Human Rights Act (1998). In terms of health and education, they are one of the most deprived groups in the Britain:
>
> • Life expectancy for Gypsy and Traveller men and women is 10 years lower than the national average.
>
> • Gypsy and Traveller mothers are 20 times more likely than the rest of the population to have experienced the death of a child.
>
> • In 2003, less than a quarter of Gypsy and Traveller children obtained five GCSEs and A*- C grades, compared to a national average of over half.4

John Gavin was a well-known Traveller and had many connections in the villages where Bridget and the children sought refuge from him. They lived in a constant state of anxiety, uncertainty, and financial instability. As Mr. Gavin explained in his pre-sentence interview, his mother's mental health declined as the children got older. Elijah's oldest brother became the leader of the family as a teenager. Elijah made money by refurbishing tools and other items and selling them in local street

---

3 House of Commons Women and Equalities Committee: *Tackling inequalities faced by Gypsy, Roma and Traveller Communities*, Seventh Report of Session 2017-19; https://publications.parliament.uk/pa/cm201719/cmselect/cmwomeq/360/360.pdf
4 *Gypsies and Travellers: Simple Solution for Living Together*, Equality and Human Rights Commission, March 2009; https://www.equalityhumanrights.com/sites/default/files/2021/gypsies_and_travellers_0.pdf

markets. He gave all the proceeds to the family. It wasn't much, but the money was needed. The family couldn't afford to send Elijah back to school.

As a teenager, Elijah and his brother were targeted for recruitment by para-military gangs connected to the Provisional Irish Republican Army (IRA). Vigilante gangs like Direct Action Against Drugs (DAAD) and Republican Action Against Drugs (RAAD) were formed by former Provos. They shook down and murdered alleged drug dealers, and sometimes one another. In 2012, RAAD announced that it was joining forces with another offshoot, the Real Irish Republican Party, to form the new IRA.

Elijah and his brother escaped the gangs when their mother moved the family to a new village. Elijah married his wife Pearl when he was just 18 years old. They were happy for a time, but his mental health soon began to deteriorate. He was functionally illiterate and started cage fighting when he couldn't find a job. Around this time, the family learned that John Gavin had committed suicide by overdosing. Elijah made his first suicide attempt by hanging a month before Christmas of that year. He was hospitalized and later began therapy, but didn't stick with it. His compliance with psychiatric medication was also poor. He attempted suicide again by overdosing on his prescription pills. An evaluation conducted sometime later, revealed that Elijah was likely experiencing early signs of schizophrenia.

Arrests and periods of incarceration occurred during this time, but there were joyful events as well. Elijah and Pearl welcomed three children in five years. However,

his inability to find stable employment, continuing mental health struggles, and mounting arrests put a strain on their marriage.

When Elijah and Pearl and their children left Northern Ireland for the United States in 2022, he may have been seeking a better life, but he was also fleeing a prison sentence there. When he is returned to the United Kingdom, he faces further prosecution and imprisonment.

## NATURE AND CIRCUMSTANCES OF THE OFFENSE

"When I brought my wife and children to the United States, I truly wanted to live a better life, an honest life and set an example for my kids. As you probably know, I was also on the run from the law in my country. I made a very bad choice in running away from the mistakes I made there. I thought I was giving myself and my family a fresh start, but I was always thinking that I would get caught. It was no way to live. When I cheated these people, I told myself that I needed to do it to support my family. I was lying to myself. I made a huge mistake and only made my situation worse. I put my wife and children in danger and hurt innocent people who trusted me to help them fix their homes." (Letter from Elijah Gavin to the Court, attached as Exhibit A.)

As Elijah Gavin told U.S. Probation, he found work in the United States by going to Home Depot early in the morning and joining work crews as a day laborer. However, this attempt at honest employment was short lived. He made the choice to defraud his victims in a home improvement scheme instead.

"I feel bad, but I know the victims feel worse. They let me into their homes and trusted me. I abused their trust and did the wrong thing just to benefit myself, I

am truly sorry. I know this sounds funny, but I would like to thank the government for catching me so these victims can have some justice. It's what I would want if someone cheated my own mother. I want to thank you, Your Honor, for helping them get justice as well. They deserve it and I deserve whatever consequences come from this." (Letter from Elijah Gavin).

## SENTENCING FACTORS AND CONSIDERATIONS

Under the provisions of 18 U.S.C. § 3553(a), in order to determine an appropriate sentence that is sufficient but not greater than necessary, the Court shall consider the following:

(1) The nature and circumstances of the offense and the history of the defendant;
(2) The need for the sentence imposed:
      (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
      (B) to afford adequate deterrence to criminal conduct;
      (C) to protect the public from further crimes of the defendant; and
      (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) The kinds of sentences available;
(4) The applicable category of offense committed by the applicable category of defendant as set forth in the guidelines;
(5) Any pertinent policy statement issued by the Sentencing Commission;
(6) The need to avoid unwarranted sentence disparities among the defendants with similar records who have been found guilty of similar conduct; and
(7) The need to provide restitution to any victims of the offense.

The most compelling of these considerations support a sentence of 24 months. The sentencing guidelines suffer from a significant and fundamental flaw. The system is intended to follow 18 U.S.C. § 3553(a) but fails to take any individual aspects of a defendant's life into account. The statute requires consideration of a defendant's

"history and characteristics" at sentencing (§ 3553(a)(1)), but the guidelines only consider the offense conduct and any criminal record.

For example, U.S. Probation must administer and score the Adverse Childhood Experiences (ACEs) assessment during the presentence interview. ACEs consists of ten questions that evaluates traumatic events involving abuse, neglect, and household dysfunction that occur during childhood (prior to age 18). Mr. Gavin's score is significant and informative but has no effect on his total offense level.

While the Court is required to consider the advisory guideline range when determining the proper sentence, it does not have to accept that calculation as the appropriate penalty.

## REAL SENTENCING CONSIDERATIONS

The statute gives the Court direction on information to consider and the objectives to strive for when determining the appropriate sentence in each case. 18 U.S.C. § 3553 (a). The law directs the Court to impose a sentence which is the least restrictive means to achieve these objectives: punishment, deterrence, protection of the public, and rehabilitation. The Court must weigh a defendant's background in addition to the conduct encompassing the offense. The Court also considers the guideline calculation as an advisory recommendation, but that does not take precedence over other considerations. Ultimately, the Court decides what is the

appropriate sentence for Elijah Gavin given his personal history, particularly the challenges he has faced since birth.

Incarceration presents the most severe mechanism for punishment in any sentence. However, the Court can consider that fact that Mr. Gavin has used his time in custody for rehabilitative purposes. He participates in bible and religious studies at Wyatt and, according to the Chaplain, assists other inmates who have issues and problems. (Letter from Wyatt Chaplain Leo Mogavero attached as Exhibit B).

Mr. Gavin uses the tablet provided by Wyatt to improve his reading and writing skills. He has completed multiple programs, including GED preparation. According to his Unit Manager and the Programs Director, Mr. Gavin maintains a positive attitude, is respectful towards both staff and his peers. He also participated in the worker program and demonstrated a great work ethic and always received good work evaluations. (Letter from Wyatt Unit Manager and Programs Director attached as Exhibit C).

Mr. Garvin hopes to work and take advantage of any available BOP opportunities and educational programs but understands that he will not be eligible for any "earned good time" envisioned by the First Step Act (FSA) because of the immigration detainer lodged against him. Furthermore, he cannot take part in any of the BOP's building trades program because he doesn't have a high school diploma or

GED. Finally, the international warrants will likely affect Mr. Gavin's BOP severity
score and result in an adverse classification and designation determination.5

The government agreed to support Mr. Gavin's international prisoner transfer
request, but there is no guarantee it will be granted. If it is denied, he will continue to
be held, in immigration custody, beyond the expiration of his sentence as he awaits
deportation.

Elijah Gavin longs to be with his wife and children again. Letters of support
from his wife, mother, aunt, and a longtime family friend describe his dedication to
his family and the remorse he feels for his crimes. (Support letters attached as Exhibit
D).

Elijah Gavin deeply regrets the harm he brought to his victims and knows that
he must be punished for his crimes. In prison, he will focus on improving himself by
focusing on his education, mental health, and sobriety. He asks the Court to
recommend that he participate in the BOP's RDAP program. He knows that he must
address the trauma from his childhood and teen years if he is to live a healthy, crime
free life. He wants that for himself and his children.

**CONCLUSION**

Elijah Gavin asks that the Court consider his history and characteristics, the
nature of the offenses, and the collateral consequences of the conviction, and impose

---

5 BOP Program Statement 5100.08.

a sentence of 24 months. The proposed sentence adequately addresses society's need for punishment and deterrence and is sufficient but not greater than necessary to serve the purposes of sentencing. *See* 18 U.S.C. § 3553(a).

Respectfully submitted
ELIJAH GAVIN
By his attorney,
*/s/ Joanne M. Daley*
Joanne M. Daley, BBO #653375
Assistant Federal Defender
Weybosset St., Ste. 300
Providence, RI 02903
(401) 528-4281; FAX 528-4285
joanne_daley@fd.org

## CERTIFICATION

I hereby certify that a copy of this MEMORANDUM was delivered by electronic notification to Sandra Hebert, Assistant United States Attorney on September 19, 2025.

*/s/ Joanne M. Daley*